## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Ramon Romero, (R23572), | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 19 C 4991 |
| v. | ) | |
| | ) | Judge John Robert Blakey |
| John Varga, Warden, | ) | |
| Dixon Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Petitioner Ramon Romero, an Illinois prisoner at the Pontiac Correctional Center, brings this *pro se* habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his convictions for attempted first-degree murder, aggravated vehicular hijacking, attempted aggravated vehicular hijacking, and aggravated battery from the Circuit Court of Cook County. *See* [1], [6]. For the reasons explained more fully below, the Court denies the petition on the merits and declines to issue a certificate of appealability.

## I. Background[1]

Following a bench trial, Petitioner was found guilty of two counts of attempted first-degree murder of a police officer, three counts of aggravated vehicular hijacking,

---

[1] The Court draws these facts from the state court record [24] and the state appellate court's decision on direct appeal. *People v. Romero*, 105 N.E.3d 1048 (Ill. App. Ct. 2018). The Court presumes the state court's factual findings to be correct unless Petitioner rebuts this presumption by clear and convincing evidence. *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citing 28 U.S.C. § 2254(e)(1); *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018)); *see also Ward v. Hinsley*, 377 F.3d 719, 721 (7th Cir. 2004) ("[W]e presume the state court's recitation of the facts to be correct.").

one count of attempted aggravated vehicular hijacking, and two counts of aggravated battery. *People v. Romero*, 105 N.E.3d 1048, 1062 (Ill. App. Ct. 2018). Petitioner did not deny that he committed these offenses but claimed he suffered from a psychotic episode at the time, and thus should not be held accountable; this was the sole issue before the trial court. *Id.* at 1054.

### A.     Petitioner's Offenses and Arrest

On September 11, 2010, Petitioner called Abraham Cardenis, a pastor at Faith Baptist Church in Kankakee, Illinois, who Petitioner knew from attending church on occasion, and asked Cardenis to pick him up at Midway Airport. *Id.* at 1055. Cardenis drove his blue Mazda Tribute from Kankakee to Chicago to pick up Petitioner. *Id.* Cardenis' brother-in-law accompanied him. *Id.* Before getting in Cardenis's car, Petitioner smashed his cellphone on the ground. *Id.* The three drove around for an hour looking for the expressway to drive back to Kankakee. *Id.* Once they found it, Petitioner decided he had changed his mind about where he wanted to go, so Cardenis pulled over to the side of the road and told Petitioner he was not a taxi driver and would not be driving him anywhere but Kankakee. *Id.* at 1555–56. Petitioner then pulled out a gun, forced Cardenis and his brother-in-law out of the car, and drove off. *Id.* Cardenis called the police. *Id.*

That evening, Fallon Jackson was sitting in her living room when she heard an argument coming from the parking garage below. *Id.* Jackson went down to the garage and saw Petitioner arguing with one of her close friends. *Id.*; *see also* [24-12]

2

at 45. Petitioner claimed he needed gas. *Romero*, 105 N.E.3d at 1055. Jackson noticed he was standing near a damaged blue car that appeared to be leaking radiator fluid. *Id*. She called the police to report the disturbance. *Id*.

Chicago police officers Aaron Davis and Tiawansa Davis arrived on the scene and saw Jackson and Petitioner. *Id*. They noted Petitioner was wearing a white hooded sweatshirt with a green design on it. *Id*. Jackson tried to explain to the officers what was going on, but Petitioner kept interrupting her. *Id*. He pulled an orange bible out of his pocket and told Officer Tiawansa Davis that she needed to read it. *Id*. He then approached Officer Aaron Davis, who admonished him not to walk up on him. *Id*. The officer asked Petitioner to leave the area, but he refused. *Id*. Davis told Petitioner if he did not leave, he would be arrested. *Id*. In response, Petitioner pulled out his gun and shot at Officer Aaron Davis's chest. *Id*. Both officers and Jackson ran for cover. *Id*. They heard Petitioner fire at least one more shot. *Id*. Petitioner tried to drive away in the officers' police vehicle, but he could not start it because he did not have the keys. *Id*. Officer Tiawansa Davis fired her gun at Petitioner while he was in the police vehicle and then took cover with Officer Aaron Davis, who had been shot in the left shoulder. *Id*.

Milot Cadichon, an off-duty police officer, saw Petitioner fire at Officer Tiawansa Davis through his apartment window before Petitioner fled the scene. *Id*. He watched Petitioner stop a red minivan in the street and force the driver out at gunpoint. *Id*. Petitioner was unable to operate the minivan because it had been

3

customized for the owner who had a disability. *Id.* at 1057. He abandoned the minivan after driving it only a short distance and stopped a vehicle travelling in the opposite direction. *Id.* at 1056–57. Petitioner again forced the driver out at gunpoint and drove off. *Id.* at 1056.

Hours later, Petitioner went to a nightclub in Chicago Heights where he met Juan Zavala. *Id.* at 1057. Petitioner introduced himself as "Elisio," and Zavala invited him to join his group of friends at the club. *Id.* The two were outside smoking cigarettes when the police arrived. *Id.* The police began checking IDs and arrested Petitioner. *Id.* Zavala gave the police Petitioner's white hooded sweatshirt, which he had previously taken off and left in the club before the police arrived. *Id.* at 1057, 1068, 1071.

### B.    Pre-Trial Fitness Hearings

Prior to trial, the court conducted two fitness hearings to determine whether Petitioner was fit to stand trial. *Id.* at 1054. The first fitness hearing was held in June 2013. *Id.* Susan Buratto, a forensic psychiatry fellow at Northwestern Memorial Hospital, testified that she and her training director, Dr. Stephen Dinwiddie, diagnosed Petitioner with bipolar disorder. *Id.* Buratto explained that Petitioner was taking medication at the time of their evaluation, and it was her opinion that he would be fit to stand trial with medication. *Id.* The parties also stipulated to a report from the Circuit Court of Cook County's Forensic Clinical Services that was prepared by Dr. Nishad Nadkarni. *Id.* While Dr. Nadkarni's

4

report acknowledged that Petitioner was prescribed Depakote, Risperdal, and Klonopin,[2] the doctor did not believe Petitioner required the medication to maintain his fitness for trial. *Id.* The trial court found Petitioner fit to stand trial with medication. *Id.*

The court held a second fitness hearing in May 2014 at the request of defense counsel, who expressed concerns about Petitioner's fitness following a three-week hospitalization where he had been taken off his medication. *Id.* at 1054–55. Dr. Nadkarni of Forensic Clinical Services testified that he evaluated Petitioner two weeks prior to the hearing and diagnosed him with antisocial personality disorder with narcissistic features, as well as cannabis-, cocaine-, and alcohol-use disorder. *Id.* at 1055. Nearly 650 pages of Petitioner's medical records from 2010, 2011, and 2012 through 2014 had been tendered to Dr. Nadkarni before the hearing. *Id.* He explained that the records did not change his opinion that Petitioner did not show a *bona fide* mental illness, as they were largely duplicative of the records he had reviewed prior to testifying. *Id.* Dr. Nadkarni concluded that Petitioner was fit to stand trial without medication, as his medical records showed his behavior was

---

[2] Depakote is the brand name of Divalproex Sodium, a medication prescribed to treat the manic phase of bipolar disorder (manic-depressive illness) and helps prevent migraine headaches. Divalproex Sodium, Mayo Clinic, *available at*: https://www.mayoclinic.org/drugs.sodium./drg-20072886?p=1 (last visited May 2, 2022). Risperdal is the brand name of Risperidone, a medication prescribed to treat schizophrenia, bipolar disorder, or irritability associated with autistic disorder. Risperidone, Mayo Clinic, *available at*: https://www.mayoclinic.org/drug-20067189?p=1 (last visited May 2, 2022). Klonopin is the brand name of Clonazepam, a medication used to treat panic disorders. Clonazepam, Mayo Clinic, *available at*: https://www.mayoclinic.org/drugs-supplements/clonazepam-oral-route/description/drg-20072102 (last visited May 2, 2022).

consistent regardless of whether he was taking medication or not. *Id.* The trial court found that Petitioner was fit to stand trial without medication. *Id.*

### C.    Petitioner's Insanity Defense

At trial,[3] Petitioner did not dispute that he committed the crimes charged but argued that he was mentally unfit and lacked the ability to appreciate the criminality of his conduct at the time of the offense. *Id.* at 1054; *see also* 720 ILCS 5/6-2(a). To support his insanity defense, Petitioner called his wife, Mandy Romero, and psychiatric expert Dr. Dinwiddie. *Id.* at 1057–60.

Mandy testified regarding Petitioner's actions and appearance following the birth of their son in August 2009 and leading up to the incidents a year later. *Id.* at 1057, 1078–79; [24-14] at 55. The court precluded her from testifying as to statements Petitioner made during the different episodes she discussed and reminded her just to explain her observations of Petitioner's behavior. *Id.* at 1078–79; [24-13] at 56, 58, 67, 79–80, 85. Mandy explained that Petitioner became increasingly paranoid after their son was born and refused to go home once she was discharged from the hospital. *Romero*, 105 N.E.3d at 1057. Instead, he drove her and their newborn to her mother's house because he believed people were coming after him. *Id.* Mandy knew Petitioner had previously been a member of the Latin Kings. *Id.* He stayed up all night pacing, so Mandy took him to Condell Medical Center where

---

[3] Petitioner attended the first day of the bench trial; however, he refused to attend the remainder of the proceedings because he was not permitted to wear a suit. *Romero*, 105 N.E.3d at 1055 n. 1. The trial court found he freely and voluntarily waived his right to be present at the proceedings and arranged for him to listen to the proceedings from lock-up. *Id.*; *see also* [24-12] at 14–15.

he was treated for anxiety. *Id.* Mandy was unsuccessful in her attempt to also have Petitioner treated by a psychiatrist, and she testified that his paranoia subsequently got worse. *Id.*

One night after their newborn urinated on their bed, Petitioner believed that Mandy was trying to kill them with their son's urine. *Id.* At Petitioner's request, she immediately put the sheets in the washing machine along with some of his work shirts. *Id.* Petitioner, however, removed his clothing from the washing machine while it was running, ran outside, and started looking through the bushes. *Id.* Mandy became scared when Petitioner started rambling and called the police who told him to leave the house for the night. *Id.* Mandy testified that she found Petitioner the following morning at the train station and told him to go to his mother's house in Kankakee. *Id.* A week later she discovered he was in jail. *Id.* at 1058. Mandy and his mother signed a petition to have him involuntarily committed, and he was sent to Riverside Hospital for evaluation. *Id.* He was then admitted to Tinley Park Mental Health Center for seven days and was prescribed Clonidine[4] and Risperidone. *Id.*

Following his discharge, Petitioner continued to receive outpatient treatment at Helen Wheeler Medical Center in Kankakee. *Id.* His medication frequently changed because Petitioner complained of the side effects until he eventually stopped

---

[4] Clonidine is a medication prescribed to treat high blood pressure. Clonidine, Mayo Clinic, *available at*: https://www.mayoclinic.org/drugs-supplements/clonidine-oral-route/description/drg-20063252 (last visited May 2, 2022).

taking his medication in May 2010 and began to self-medicate with marijuana and cocaine. *Id.* at 1057–58. Mandy explained that, after Petitioner stopped taking his medication, he went into a "downward spiral": he became anxious; would ramble and talk about the same subject all day; believed people were coming after him; stopped eating and sleeping. *Id.* at 1057. At this point, Mandy refused to let him watch their children; she testified that she last saw Petitioner in August of 2010. *Id.*

Dr. Dinwiddie testified as an expert in psychiatry and opined that Petitioner suffered from a mental disease and lacked the substantial capacity to understand the criminality of his conduct at the time of the offense. *Id.* In reaching this conclusion, Dr. Dinwiddie reviewed the medical records from Helen Wheeler Center, Riverside Hospital, and Tinley Park Mental Health Center; the police reports regarding the offense; and the Cook County Forensic Clinical Services reports. *Id.* He also conducted a three-and-a-half-hour interview with Petitioner. *Id.*

Dr. Dinwiddie testified that Petitioner suffered from bipolar effective disorder:

> classified as a major [disorder]—primarily a disorder of mood and it has two characteristics. One is it's called a relapsing remitting illness, that is it comes and goes so that if you see an individual during a period of remission either because of the natural course of the illness or because they have been adequately treated, they look perfectly, perfectly normal.

*Id.* He explained that Petitioner's symptoms began with the persecutory delusion that his wife was trying to kill him with their son's urine, improved when he was institutionalized and given medication, and then returned in the summer of 2010 when he stopped taking his medication. *Id.* at 1058.

Dr. Dinwiddie testified that, during their interview, Petitioner demonstrated some ability to understand the consequences of his actions: Petitioner explained that he did not want to go to his aunt's house after he hijacked Cardenis' car because he feared he would be arrested; he explained that he got into an accident while driving Cardenis' car, so he hid the vehicle in Jackson's parking garage and removed the deployed airbag so that it wouldn't be noticeable; and he also told the doctor that he drove to Michigan after shooting at the police to go to a casino to have some fun because he knew he would soon be "apprehended or gunned down." *Id.* at 1059. But Dr. Dinwiddie explained that there was more than one way to interpret Petitioner's actions and, just because he may have been acting normally at one point, does not mean that he was not suffering from a manic episode. *Id.* at 1059–60. Dr. Dinwiddie testified that, although Petitioner's flight from the scene was consistent with a rational appreciation of the situation, it could also be consistent with a delusional belief (e.g., "that the devil is after me or the Martians are going to eat my brains or something."). *Id.* Similarly, although Petitioner's act of leaving his sweatshirt demonstrated an attempt to hide his tracks by ridding himself of easily identifiable clothing, it could also be consistent with someone who is "manic, impulsive, and giving things away." *Id.* at 1068.

Dr. Dinwiddie opined, based upon Petitioner's history of persecutory delusions, that "the most likely explanation for his behavior was that it was impelled by his mental illness and the delusions his mental illness caused." *Id.* at 1060.

9

In rebuttal, the State presented Dr. Nadkarni to offer his opinion regarding Petitioner's sanity at the time of the offense. *Id.* Dr. Nadkarni opined that Petitioner did not suffer from a mental disease or defect, and he based his opinion upon his two evaluations of Petitioner and his review of medical records from Tinley Park Mental Health Center, Helen Wheeler Medical Center, Condell Medical Center, and Cermak Health Services, as well as 2009 medical notes from one of Petitioner's doctors and the reports from Cook County Forensic Clinical Services. *Id.* Dr. Nadkarni noted that his review of the records revealed no indication that Petitioner had ever been diagnosed with any major mental illness. *Id.*

Dr. Nadkarni further opined that Petitioner's actions at the time of the offense indicated that he appreciated the criminality of his actions. *Id.* at 1061. He noted that Petitioner fled after stealing Cardenis' car, hid the stolen car in a parking garage, fled the scene after the shooting, and asked if the nightclub was checking identification upon arriving. *Id.* at 1061. The doctor described these behaviors as goal-directed, logical, organized, and indicative that Petitioner understood or appreciated the illegal nature of his actions. *Id.* Dr. Nadkarni also disagreed with Dr. Dinwiddie's diagnosis of bipolar effective disorder and manic episodes. *Id.* at 1060. He believed Petitioner suffered from antisocial personality disorder with narcissistic features, causing him to violate the rights of others to feel "grandiose in himself" and lack empathy for others. *Id.*

10

Dr. Nadkarni testified that Petitioner had been a leader in the Latin Kings, but was stripped of his gang leadership role in 2008 and feared members of the Latin Kings were out to get him. *Id.* The doctor explained that Petitioner's fears were thus reality-based, not delusional paranoia. *Id.* at 1060–61. While there were reports that Petitioner was combative and oppositional during his detention at the Cook County Jail, there were no reports of delusions, hallucinations, or other signs of mania. *Id.* at 1061. As a result, Dr. Nadkarni found such behaviors consistent with antisocial and narcissistic personality disorder, not a major mental illness. *Id.*

In sur-rebuttal, Dr. Dinwiddie acknowledged that he agreed with Dr. Nadkarni's antisocial personality disorder diagnosis but noted that Petitioner also suffered from bipolar effective disorder, which caused him to experience two psychotic episodes: one a year before the incident when he thought Mandy was trying to kill him with their son's urine, and the second at the time of the offense. *Id.*

Dr. Dinwiddie further distinguished between two types of delusions: he explained bizarre delusions as those that are clearly not plausible, such as "brain-eating Martians," and claimed Petitioner's reality-based fear of the Latin Kings was a non-bizarre delusion because the validity of the fear was brought into question by the fact that it included the fear that his wife was trying to poison him. *Id.*

Finally, Dr. Dinwiddie criticized Dr. Nadkarni's failure to review Petitioner's medical records from his two-day stay at Riverside Hospital. *Id.* at 1062. He

11

explained that these records were relevant because they described Petitioner's behavior and symptoms at the time of his involuntary commitment.   *Id.*

### D.    The Trial Court's Ruling on Insanity

In its ruling, the trial court noted that, with the exception of the Riverside Hospital medical records, Dr. Dinwiddie and Dr. Nadkarni, both experts, had reviewed the same materials in evaluating Petitioner and rendering an opinion.   *Id.* The court then summarized the evidence and Petitioner's background and ruled that Petitioner's actions were caused by his antisocial personality disorder. *Id.*   The trial court explained that around the time Petitioner was institutionalized, he had increasing paranoia about retaliation from the Latin Kings, and "[n]ot because of some delusional thought that the Martians are chasing him and they're going to eat his brains."  *Id.*   The court observed that Petitioner's paranoia coincided with the birth of his son and was a "very real fear that he could at some point be set upon by some very evil men who would do him and his family harm."   *Id.*

The trial court also found that Petitioner's attempts to avoid detection and apprehension from the police after the shooting and carjackings were not impelled by psychotic delusions, but rather were indicative of goal-oriented actions motivated by real fears. *Id.*

Regarding Dr. Dinwiddie's diagnosis and opinion, the court found that, although the doctor was unequivocal in his opinion that Petitioner suffered from a mental illness and lacked substantial capacity to appreciate the criminality of his

offense, he equivocated in some of his other testimony that described the dueling interpretations of Petitioner's behaviors—rational versus manic. *Id.*; [24-14] at 214–21. The court found that Dr. Dinwiddie's testimony failed to prove by clear and convincing evidence that Petitioner suffered from a mental disease that caused him not to appreciate the criminality of his conduct. *Id.*[5] The trial court therefore rejected Petitioner's insanity defense and found him guilty. *Id.*

The trial court sentenced Petitioner to concurrent terms of imprisonment of 45 years for attempted first-degree murder of a police officer, 30 years for aggravated vehicular hijacking, 8 years for attempted aggravated vehicular hijacking, and 3 years for aggravated battery. *Id.* at 1063.

### E.    Petitioner's Direct Appeal and PLA

Petitioner, with the assistance of court-appointed counsel, filed a direct appeal, arguing that: (1) the trial court's ruling went against the manifest weight of the evidence because it was based upon the State's expert who failed to consider critical aspects of Petitioner's mental health history; (2) the trial court deprived Petitioner of a fair trial when it assumed the role of prosecutor in questioning Petitioner's expert and demonstrated judicial bias against Petitioner; (3) Petitioner was denied his right to present a defense when his wife was not allowed to testify regarding out-of-court statements made by Petitioner that were relevant to his state of mind; and (4)

---

[5] In Illinois, the burden of proof for an insanity defense is on the defendant who must "prove by clear and convincing evidence that the defendant is not guilty by reason of insanity." 720 ILCS 5/6-2.

Petitioner was denied effective assistance of counsel when his trial attorney failed to preserve the exclusion-of-testimony issue for his direct appeal.   [24-1] at. 22–52.

The state appellate court rejected these arguments and affirmed, finding as to the latter that Petitioner had waived his excluded testimony claim by failing to object to the exclusion of his wife's testimony at trial and failing to raise the issue in his post-trial motion.   *Romero*, 105 N.E.3d at 1080.   The court rejected his remaining claims on the merits.   *Id.* at 1068, 1072, 1076, 1080.

In his counseled petition for leave to appeal (PLA) to the Supreme Court of Illinois, Petitioner raised only the excluded testimony claim, arguing that the appellate court's rejection of his claim created a conflict among state appellate court decisions regarding the relevance of state-of-mind evidence in insanity cases.   [24-5] at 1–19.   The Illinois Supreme Court denied his PLA.   *People v. Romero*, 108 N.E.3d 856 (Ill. 2018).   Petitioner then filed a petition for a writ of certiorari in the United States Supreme Court, which the Court denied. *Romero v. Illinois*, 139 S. Ct. 1557 (2019).

Petitioner then filed the instant *pro se* 28 U.S.C. § 2254 petition [1], [6].

## II.   Analysis

Petitioner's § 2254 petition presents the following claims for this Court's consideration:[6]

---

[6] Petitioner raises three claims in his § 2254 petition, [6], but Respondent's response further divides Petitioner's Claim Two into two claims, resulting in a total of four claims as opposed to three.   *See* [23].   For clarity purposes, the Court uses Respondent's numbering.

14

| | |
|---|---|
| <u>Claim 1</u>: | The trial court's rejection of Petitioner's insanity defense, choosing to accept the opinion of the State's expert over that of Petitioner's expert, denied him of due process and equal protection of the law; |
| <u>Claim 2</u>: | Petitioner was denied his right to a jury trial; |
| <u>Claim 3</u>: | The trial court's lengthy examination of, and bias against, Petitioner's expert witness denied him of due process and equal protection of the law; and |
| <u>Claim 4</u>: | Petitioner was denied his right to present a defense where the trial court did not allow his wife to testify to out-of-court statements made by Petitioner. |

[6] at 5–6.

Respondent correctly argues that Petitioner has procedurally defaulted all four of his claims, and thus is not entitled to federal habeas relief.

## A.   Procedural Default

A § 2254 claim can be procedurally defaulted in two ways.   The first occurs when a petitioner fails to fully exhaust state court remedies for his federal claim, and he no longer has the ability to do so under the state's procedural laws.   *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016). Prior to seeking federal habeas relief, petitioners must exhaust the "remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A).   A petitioner must "give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts," which is accomplished "by invoking one complete round of the State's established appellate review process," including the filing of a PLA to the Supreme Court of Illinois.   *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

15

The second type of procedural default "comes from the independent and adequate state ground doctrine." *Thomas*, 822 F.3d at 384 (citing *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991)). When a state court "refuses to reach the merits of a petitioner's federal claims because they were not raised in accord with the state's procedural rules . . ., that decision rests on independent and adequate state procedural grounds." *Kaczmarek v. Rednour*, 627 F.3d 586, 591 (7th Cir. 2010).

Principles of "comity, finality, and federalism" underscore both types of procedural default. *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017); *Thomas*, 822 F.3d at 384. State courts, like federal courts, are "obliged to enforce federal law," and when a petitioner alleges his state conviction violates the Constitution, "state courts should have the first opportunity to review this claim and provide any necessary relief." *Boerckel*, 526 U.S. at 844. Failing to present constitutional challenges to the state courts or presenting them in a way that does not comply with state law, deprives the state courts of "an opportunity to address those claims in the first instance." *Coleman*, 501 U.S. at 732.

## B.    Claims One, Two, and Three – Failure to Exhaust

Petitioner raised Claims One and Three (that the trial court's rejection of his insanity defense and the trial court's treatment of Petitioner's expert witness deprived him of a fair trial) on direct appeal in the state appellate court, but he failed to include them in his PLA to the Illinois Supreme Court following the appeal. *See* [24-5] at 13–18. Petitioner's PLA on direct review argued only that his wife should

16

have been permitted to testify to Petitioner's out-of-court statements. Nor did Petitioner pursue post-conviction relief on these claims, or any other claims.[7] In failing to present Claims One and Three to the Illinois Supreme Court, as required, Petitioner has procedurally defaulted these claims. *Boerckel*, 526 U.S. at 845.

As for Claim Two, Petitioner failed to raise this claim before any Illinois state court, presenting it for the first time in his § 2254 petition. He thus procedurally defaulted Claim Two as well. *Id.* at 845; *see also Dortch v. O'Leary*, 863 F.2d 1337, 1342 (7th Cir. 1989) ("A petitioner who fails to raise a claim in the state courts cannot thereafter raise it for the first time in a petition for writ of habeas corpus."); *Melecio v. Hinthorne*, No. 19 C 50280, 2020 WL 7183742, at *7 (N.D. Ill. Dec. 7, 2020) (procedural default occurs where the petitioner "failed to present his federal claim to the state courts and the opportunity to raise that claim has subsequently passed").

## C.    Claim Four – Independent and Adequate State-Law Grounds

Claim Four involves the second type of procedural default. The state appellate court on direct appeal, the last state court decision addressing this claim, determined the claim was waived because Petitioner failed to object to the exclusion of Mandy's testimony at trial and failed to include the issue in his post-trial motion. *Romero*, 105 N.E.3d at 1076, 1080; *see also* [24-9] at 44-47. Petitioner's motion for a

---

[7] Under Illinois law, the statute of limitations for filing a post-conviction petition in Petitioner's case ran six months after the United States Supreme Court denied his petition for writ of certiorari on April 15, 2019. *See Romero*, 139 S. Ct. 1557; *see also* 725 ILCS 5/122-1(c).

new trial argued only that Mandy's testimony regarding Petitioner's behavior was unimpeached and not that the exclusion of certain testimony constituted error.

Under Illinois law, the failure "to include any and all claims of error in a post-trial motion for a new trial…amounts to a waiver of the claim" and, when relied upon by the state court, results in a procedural default.  *Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005) (citing 725 ILCS 5/116-1; *People v. Enoch*, 522 N.E.2d 1124, 1129–30 (1988)); *see also Sturgeon v. Chandler*, 552 F.3d 604, 611 (7th Cir. 2009) ("A finding of waiver by the state [] court is enough to establish an adequate and independent state ground.").   Claim Four thus is procedurally defaulted based upon Petitioner's waiver.   *See Rodriguez v. McAdory*, 318 F.3d 733, 735 (7th Cir. 2003); *see also Anderson v. Lashbrook*, No. 17 C 08350, 2020 WL 5251615, at *7 (N.D. Ill. Sept. 3, 2020), aff'd sub nom. *Anderson v. Brookhart*, 19 F.4th 980 (7th Cir. 2021).

Acknowledging his omission, Petitioner asked the state appellate court to review the issue for plain error.[8] *Romero*, 105 N.E.3d at 1076; *see also* [24-1] at 49. The state court's review of Petitioner's claim for plain error, however, "does not cure [the] procedural default" of Claim Four. *See Rodriguez*, 318 F.3d at 735 (collecting cases); *see also Kaczmarek*, 627 F.3d at 592 ("We consistently have held that where a state court reviews a federal constitutional claim for plain error because of a state procedural bar (here, the doctrine of waiver), that limited review does not constitute a decision on the merits."); *Leibach*, 394 F.3d at 992 ("[A]n Illinois court does not

---

[8] Upon reviewing Petitioner's claim, the state court concluded there was "no error warranting plain error review" and "honor[ed] defendant's forfeiture of the issue." *Romero*, 105 N.E.3d at 1080.

reach the merits of a claim simply by reviewing it for plain error."). Claim Four is procedurally defaulted.[9]

### D. Exceptions to Procedural Default

A Court may nonetheless exclude a petitioner's procedural default if he demonstrates: (1) "cause for the default and actual prejudice"; or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice," i.e., that "new reliable evidence" exists such that "no reasonable juror would have convicted" petitioner in light of such evidence. *Thomas*, 822 F.3d at 386–87 (quoting *Coleman*, 501 U.S. at 750). Neither exception applies here.

To establish "cause" to excuse his procedural default, Petitioner must show that some objective factor external to the defense impeded his efforts to comply with the State's procedural rule. *Davila*, 137 S. Ct. at 2065. Attorney error that amounts to "a deprivation of the constitutional right to counsel" is an "objective external factor" sufficient to constitute cause. *Id.*; *see also Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007). But to properly assert ineffective assistance of counsel as cause for the default, the ineffective assistance claim, itself, must be properly

---

[9] Petitioner's counseled PLA also failed to fairly present his federal claim to the Illinois Supreme Court, instead arguing that the Illinois appellate court's decision on Petitioner's direct appeal conflicted with *People v. Vanda*, 444 N.E.2d 609 (Ill. App. Ct. 1982) regarding the admissibility of state of mind evidence in insanity cases. [24-5] at 1–19; *see also Sweeney v. Carter*, 361 F.3d 327, 332 (7th Cir. 2004) (explaining that fair presentment of a claim to state courts, as required for exhaustion of the claim for habeas purposes, "requires a petition to put forward [the] operative facts and controlling legal principles" of the claim).

preserved and exhausted in state courts. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009).

Petitioner raised an ineffective assistance claim related to counsel's failure to preserve the excluded testimony issue for the state appellate court's direct review.[10] [24-1] at 51–52. But he failed to raise the claim in his PLA to the Supreme Court of Illinois. As a result, he failed to exhaust his ineffective assistance claim through one complete round of state court review, and thus cannot assert the claim as cause to excuse the procedural default of Claim Four. And Petitioner makes no other showing of cause and prejudice.[11]

Nor does Petitioner argue that a fundamental miscarriage of justice will result absent federal habeas review of his claims. This procedural default exception applies only in the rare case where "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (citation omitted). *See also McDowell v. Lemke*, 737 F.3d 476, 483 (7th Cir. 2013) (the exception "applies only in the rare case where the petitioner can prove that

---

[10] In his June 2, 2020 letter, Petitioner asked to add an additional ground to his § 2254 petition, asserting ineffective assistance of trial counsel for failing to adequately defend Petitioner "in order not to pester nor agitate" the trial judge and for failing to inform the trial court that Petitioner was off his medication throughout trial and sentencing. [15] at 1. Petitioner failed to present such an ineffective assistance claim on direct appeal in the state courts, and the claim thus is not subject to federal habeas review. *Boerckel*, 526 U.S. at 845; *Dortch*, 863 F.2d at 1342. Petitioner's failure to exhaust his ineffective assistance claims through one complete round of state court review also precludes him from asserting these claims as cause to excuse his procedural defaults. *Edwards*, 529 U.S. at 453.

[11] The Court interpreted Petitioner's March 12, 2021 letter [28] as his reply brief. *See* [29]. Unlike his *pro se* habeas corpus petition and the various letters he has written to the Court since commencing the instant § 2254 action, Petitioner's reply brief addresses matters unrelated to his habeas corpus claims or Respondent's procedural default argument.

he is actually innocent of the crime of which he has been convicted.").   To invoke the exception, a petitioner must possess "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."   *Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016) (citation omitted).   No such evidence exists here.[12]

For the reasons stated above, federal habeas relief remains unavailable for Petitioner's claims, and the Court thus denies his § 2254 petition.

## III.   Certificate of Appealability and Notice of Appeal Rights

The Court declines to issue a certificate of appealability.   Such a certificate cannot issue unless "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).   When a § 2254 petition is denied on procedural grounds, the petitioner must show both "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."   *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (holding both showings—the "one directed at the underlying constitutional claims" and the other "directed at the district court's procedural holding"—are required to be

---

[12] The Seventh Circuit has suggested that the affirmative defense of insanity could be used to support a claim of actual innocence.   *See Britz v. Cowan*, 192 F.3d 1101, 1103 (7th Cir. 1999); *see also Bivens v. Briley*, No. 00 C 7327, 2004 WL 1718437, at *4 n.1 (N.D. Ill. July 29, 2004).   But Petitioner presents no new evidence here to support his defense, and the overwhelming evidence of his guilt stands. Petitioner therefore cannot invoke the actual innocence exception to excuse his procedural default.

made "before the court of appeals may entertain the appeal").  *Id*. at 484–85.  For the reasons stated above, Petitioner cannot meet this standard.

Petitioner is advised that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within 30 days of the entry of judgment.  *See* Fed. R. App. P. 4(a)(1).  Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. But if Petitioner wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b).  Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment.  *See* Fed. R. Civ. P. 59(e).  The time to file a motion pursuant to Rule 59(e) cannot be extended.  *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon.  *See* Fed. R. App. P. 4(a)(4)(A)(iv).  Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order.  *See* Fed. R. Civ. P. 60(c)(1).  The time to file a Rule 60(b) motion cannot be extended.  *See* Fed. R. Civ. P. 6(b)(2).  A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment.  *See* Fed. R. App. P. 4(a)(4)(A)(vi).

## IV.    Conclusion

The Court denies Petitioner's habeas corpus petition [1], [6] and declines to issue a certificate of appealability.  The Court directs the Clerk to: (1) terminate

Respondent John Varga and replace him with Petitioner's current custodian, Mindi Nurse, Acting Warden, Pontiac Correctional Center; (2) alter the case caption to *Romero v. Nurse*; and (3) enter a judgment in favor of Respondent and against Petitioner. Civil Case Terminated.

Dated: September 27, 2022        Entered:

John Robert Blakey
United States District Judge

23